## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **AMERICAN AERIAL SERVICES, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) **Case No. 2:12-cv-00361-JDL** |
| **TEREX USA, LLC, and** | ) |
| **THE EMPIRE CRANE COMPANY, LLC,** | ) |
| | ) |
| **Defendants.** | ) |

## <u>ORDER ON THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>

This matter is before the court on the Motions for Summary Judgment filed by the defendants, Terex USA, LLC ("Terex") and The Empire Crane Company, LLC ("Empire") (ECF Nos. 87 and 89, respectively). After careful review, I conclude that the defendants' motions should be **GRANTED IN PART** and **DENIED IN PART**.

## I. INTRODUCTION

The plaintiff, American Aerial Services, Inc. ("American Aerial") is a Maine company which supplies cranes and labor for the construction of steel buildings and other steel structures, and also rents cranes. Pl.s Opp'n. Br., ECF No. 93 at 2. In late 2011, the president and founder of American Aerial, James Read ("Read"), decided to purchase a new crane to replace two existing cranes in American Aerial's fleet. Read Dep., ECF No. 80-1 at 12-13. One of the cranes that Read was interested in and eventually purchased was the crane which is the subject of this lawsuit – a

Terex Model T-780 truck crane ("the Crane")[1] manufactured by Terex. ECF No. 93 at 2-3.

In December 2011, Read contacted Chet Zerrillo, a salesman working for Empire, which is an authorized Terex dealer for the northeast United States, including the State of Maine. ECF No. 93 at 3. Shortly after speaking with Read about the potential purchase of a new crane and his interest in the Terex T-780, Zerrillo emailed Read on December 14, 2011, stating that, "[w]e found 1 T-780. It is at the factory, having just come off the line. I will not know until tomorrow if we can get it (however the dealer that ordered it has gotten many units from us)[.] I will not know the specs, or the price until tomorrow." ECF No. 95-7 at 2. Zerrillo attached to his email a Terex advertising brochure (the "Data Sheet") which included the Crane's various specifications and information about its lifting capacity, which was presented in the form of a "load chart." ECF No. 93 at 3. Read stated that the Data Sheet was "a primary factor" in his decision to purchase a T-780. *Id.* at 4. Each page of the Data Sheet containing load chart information also contained a disclaimer at the bottom which read, in small print, "[d]ata published herein is intended as a guide only and shall not be construed to warrant applicability for lifting purposes." Data Sheet, ECF No. 75-4 at 8-17.

Unknown to American Aerial, and contrary to Zerrillo's December 14 email, the Crane had not "just come off the line" and was not at the Terex factory, but instead

---

[1] A "truck crane" is a self-propelled hydraulic crane that is capable of driving on public roads. The crane's counterweight, boom, and jib are all transported as one unit and do not require disassembly or separate transport. *See* Read Dep., ECF No. 80-1 at 13.

was parked on a nearby storage lot.  ECF No. 77-2 at 16.   The Crane had actually been built five months earlier in July 2011, when it was purchased by a Terex distributor, Cropac Equipment, Inc. ("Cropac"), and was then parked and stored on Cropac's storage yard awaiting a final purchaser.  *Id.*; ECF No. 77-3 at 48.

On December 16, just two days after Zerrillo sent his email to Read, American Aerial signed a one-page sales contract with Empire to purchase the Crane for $615,000.00.  ECF No. 77-1.  The contract did not contain any language concerning warranties, warranty exclusions or limitations.  *Id.*  Approximately one week later, both parties agreed to a contract modification, whereby Empire agreed to deliver the Crane to American Aerial in Maine "no later than 11:49 pm on December 31, 2011." ECF No. 95-8 at 2.  American Aerial took delivery at its headquarters in Gray, Maine on December 30.  ECF No. 93 at 4.

On January 6, 2012, a technician from Empire came to Maine to perform a delivery inspection of the Crane, and determined that the Crane's engine was 22 quarts low on coolant and had likely been driven from Iowa to Maine in that condition. ECF No. 95 at 5-6, ¶¶20, 22-25.  The same day, Read wrote a letter to Zerrillo to announce that he was "revoking the acceptance" of the Crane due to a partially shredded serpentine belt in the engine and the fact that the Crane had apparently been driven 1500 miles without adequate coolant in the engine.  ECF No. 95-9 at 3. In an accompanying email sent to Zerrillo later the same day, Read stated that his primary reason for sending the letter was "to preserve all of the rights of American

Aerial Services to ensure that it received what it paid for and to timely notify all concerned parties of the problem." ECF No. 95-10 at 2.

In late February 2012, Read emailed Zerrillo again, stating that the recently-replaced serpentine belt in the Crane's engine had disintegrated again and that "the roof of the driver's cab leaks, the jib will not retract properly, the boom is not fully retracting, fluid leaks under the engine, the boom sheaves slides [sic] side to side during operation causing the cable to fall off the boom and the smell of coolant is wafting through the air as the engine ran [sic]." ECF No. 95-11 at 2. Throughout March, April, and May 2012, Read spoke by telephone with Empire personnel about the Crane's multiple problems. ECF No. 95 at 8, ¶33. In June 2012, Read sent an email to Luke Lonergan, Empire's owner, regarding "issues that remain unresolved with the [Crane] that I purchased from you," and stating additional alleged problems with the Crane, including a bent pulley, a faulty driver cab door, and an allegedly defective lock on the crane boom. ECF No. 95-12 at 2.

In August 2012, American Aerial hired a third-party vendor, Certified Boom Repair Service Northeast, LLC ("Certified Boom"), to repair damage to the "rooster sheave," a component of the Crane which bolts to the top of the main telescoping boom. ECF No. 95 at 9, ¶41. In the course of making these repairs, service personnel at Certified Boom informed Read that certain welds on the Crane's main boom and jib were defective. *Id.* at ¶42. The Crane was then inspected two weeks later by Ed Fleischer, a Terex Technical Support Representative, who met with Read to review

all of American Aerial's complaints about the Crane. Def.'s Stmt. Undisp. Mat. Fact, ECF No. 88 at 13, ¶69.

Two days after Fleischer inspected the Crane on behalf of Terex, American Aerial hired its own consultant, Roaring Brook Consultants, Inc. ("Roaring Brook"), to inspect the Crane. ECF No. 95 at 10, ¶46. As part of its inspection, Roaring Brook performed a "load test" to determine whether or not the Crane could safely lift the amount of weight for which it was rated. *Id.* at 11, ¶50. Paul Roberts, the Roaring Brook inspector, testified that he ended the load test early when the Crane was lifting only 60% of its rated capacity because he was concerned about the Crane rolling over. Roberts Dep., ECF No. 82-1 at 12-13.

In mid-September, Fleischer submitted a written report to Empire regarding American Aerial's complaints with the Crane. Fleischer Rept., ECF No. 78-11. The report recommended that an authorized dealer of the engine manufacturer replace a fan shroud which covered the engine's radiator and otherwise "troubleshoot" the Crane's engine. ECF No. 78-11 at 3 and 10. With regard to the other alleged defects, Fleischer suggested variously that the problem had already been repaired; or that it was the result of "operator error;" or was the result of unspecified "unknown repairs;" some of the asserted defects did not exist; or that the problem could be corrected by "dressing up the bad areas." *See id.* at 2-10. In short, the Fleischer report suggested that Cummins, Inc., the manufacturer of the Crane's engine, should perform work on the Crane and do follow-up troubleshooting, but that there was no corrective work for Terex to perform.

Empire did not deliver Fleischer's report to American Aerial because American Aerial did not provide Empire with information it had requested regarding the repairs performed by Certified Boom. ECF No. 103 at 16, ¶57. Instead, by email dated September 17, 2012, Empire offered to replace the fan shroud covering the engine's radiator and attempt to fix an "outrigger switch" that Read had complained of previously. ECF No. 95-17 at 2. Read declined, stating that "these repairs . . . will have no material effect on the usability of the crane." *Id.* When Read received no further proposed action to address the Crane's alleged defects, American Aerial filed this lawsuit in the Cumberland County Superior Court on October 25, 2012. ECF No. 3-1. The case was removed to this court on November 27, 2012. ECF No. 1.

## II. SUMMARY JUDGMENT STANDARD

### A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" *Johnson v. University of Puerto Rico*, 714 F.3d 48, 52 (1st Cir. 2013) (*quoting Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (*quoting Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson*, 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (*citing Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## B.     Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts

by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id.*  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id.*  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id.*

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id.*; *see also, e.g., Borges, ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(c)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

# III. LEGAL ANALYSIS

## A.     Agency Law

In order to rule on Terex and Empire's respective motions for summary judgment, it is necessary to first address the parties' arguments for and against the existence of an agency relationship between Terex and Empire.

Agency is a fiduciary relationship resulting from "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *J&E Air, Inc. v. State Tax Assessor*, 773 A.2d 452, 456 (Me. 2001) (quotation omitted). An agency-principal relationship may be based upon either actual or apparent authority. *Libby v. Concord Gen. Mut. Ins. Co.*, 452 A.2d 979, 981 (Me. 1982). In this case, there is no dispute as to the absence of actual authority. ECF No. 93 at 12; ECF No. 102 at 1. Instead, the parties dispute whether Empire was the agent of Terex pursuant to apparent authority.

Apparent authority is that "which, though not actually granted, the principal knowingly permits the agent to exercise or which he holds him out as possessing." *Steelstone Industries, Inc. v. North Ridge Ltd. Partnership*, 735 A.2d 980, 983 (Me. 1999) (*quoting Williams v. Inverness Corp.,* 664 A.2d 1244, 1246 (Me. 1995)). "Apparent authority exists only when the conduct of the principal leads a third party to believe that a given party is his agent." *Id.* (emphasis omitted). It exists "only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized." Restatement (Second) of Agency § 8, comment c (1958).

American Aerial argues that Empire was the agent of Terex based upon the following alleged conduct: Terex allowed Empire to be an authorized Terex dealer; Terex listed Empire on the "dealer locator" section of its website; Terex allowed Empire to display the Terex name and logo on Empire's website and in its retail locations; Terex supplied promotional materials such as the Data Sheet for Empire to use in selling its products; and Terex maintained control over warranty issues involving its products that Empire sold. ECF No. 93 at 12-13. To support the notion that such conduct could reasonably lead a third party to believe that an agency relationship existed, American Aerial cites *Williams v. Inverness Corp.*, 664 A.2d 1244, *supra,* where the Law Court found apparent authority between Inverness Corporation, a manufacturer of earrings and ear-piercing kits, and a jewelry store owner who used and sold Inverness products. *Id.* at 1244-45. The court based its finding of apparent authority on the fact that the jewelry cart owner used Inverness' training program, purchased ear-piercing equipment directly from Inverness, and gave third-party customers both a release form and after-care instructions that were furnished by Inverness and which bore Inverness' name. *Id.* at 1247.

Here, by contrast, there is no such evidence that Terex trained Empire personnel or sold equipment directly to Empire. None of the documents signed by American Aerial's principal, James Read, featured the Terex logo or even mentioned Terex other than to identify the type of crane being sold. Modified Contract, ECF No. 95-8 at 2. Although Terex did supply Empire with its Data Sheet, which Empire in turn furnished to American Aerial, this alone is not a sufficient basis upon which to

reasonably believe that an agency relationship existed, according to American Aerial's own cited authority. *See Malmberg v. American Honda Motor Co., Inc.*, 644 So.2d 888, 891 (Ala. 1994) ("although there was evidence that Honda logos were displayed upon signs, literature, products, brochures, and plaques at the [co-defendant's] place of business, that evidence was not sufficient, in itself, to create an inference of agency.") (quotation and emphasis omitted). This persuasive authority also weighs against finding apparent authority despite Empire's use of the Terex logo on its website, and the fact that Terex listed Empire on the "dealer locator" portion of its website.

In addition to *Malmberg,* American Aerial also cites *Azimi v. Ford Motor Company*, 977 F.Supp. 847, 851-52 (N.D. Ill., 1996) to support its claim that Empire was an agent of Terex. ECF No. 93 at 13. But both cases are distinguishable from this one. The defendant manufacturers in *Azimi* and *Malmberg* trained dealership personnel regarding their respective warranties, while there is no evidence in this case of Terex doing so. *Azimi,* 977 F.Supp. at 851; *Malmberg* at 644 So.2d at 891. In *Azimi*, Ford went so far as to train the mechanics who performed maintenance on the vehicles that were under warranty. *Azimi* at 851. Again, there is no evidence of this level of involvement by Terex in this case. *See also Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 592-93 (Ill. 1996) (plaintiffs failed to allege that manufacturer held out its dealers as agents by, among other things, requiring dealership employees to be trained by the manufacturer).

Accordingly, I am not persuaded that a reasonable jury could infer from Terex's conduct that American Aerial reasonably believed Empire to be the agent of Terex on the basis of apparent authority.

## B. COUNT ONE: BREACH OF CONTRACT AND BREACH OF WARRANTY

### 1. Breach of Contract

American Aerial asserts one claim for breach of contract against Empire and Terex, arguing that the contract called for one "new" crane, and that the Crane which was delivered was not "new" due to the fact that it sat on an open-air lot without having been properly stored or maintained for approximately five months before being delivered to Maine. Pl. Opp'n. Br., ECF No. 96 at 12-13.

The sales contract between Empire and American Aerial states that the equipment sold was a "[n]ew 2011 Terex T780 – 80 ton Hydraulic Truck Crane." ECF No. 95-8 at 2. Empire asserts that the Crane was "new" at the time of purchase because there is no evidence that the crane was utilized prior to delivery. ECF No. 89 at 6. Neither party cites any authority or statute to support its definition of the word "new," although American Aerial does cite Black's Law Dictionary, which defines "new" as "recently come into being." Black's Law Dictionary, 1140-41 (9th ed. 2009).

Maine law categorizes a truck crane as "special mobile equipment," which is defined as "a motor vehicle with permanently mounted equipment not designed or used primarily for the transportation of persons or property." 29-A M.R.S.A. §

101(70).  Unfortunately, the statute does not define "new" special mobile equipment.
*See generally* 29-A M.R.S.A.

Maine's Motor Vehicle Dealers Act, 10 M.R.S.A. § 1171-1186 ("the Dealers Act"), defines a "new motor vehicle" as "a motor vehicle that has not been previously sold to any person except a distributor, wholesaler or motor vehicle dealer for resale by franchise."  10 M.R.S. § 1171(13).  Although a "motor vehicle" in this context is a vehicle designed or used to transport people or property (a task specifically excluded from the definition of special mobile equipment), this definition nevertheless sheds light on how to distinguish a "new" truck crane from one that is not "new."

Further guidance can be found in decisions from the federal courts.  For example, the United States Environmental Protection Agency ("E.P.A.") has defined a "new" vehicle for purposes of federal environmental regulation as a "vehicle[]. . . for which the legal or equitable title ha[s] never been transferred to the ultimate purchaser," and which has not been "put to use."  *Engine Mfrs. Ass'n v. E.P.A.*, 88 F.3d 1075, 1082, 1084 (D.C. Cir. 1996).  The United States Department of Transportation ("U.S. DOT") has defined a "new" vehicle as one which "is offered for sale or lease after manufacture without any prior use."  *Toomer v. City Cab*, 443 F.3d 1191, 1195-96 (10th Cir. 2006) (*quoting* 49 C.F.R. ¶37.3).  While neither of these definitions encompasses special mobile equipment such as the Crane, it is useful to note that a common thread between the definition of a "new motor vehicle" under the Maine's Dealers Act and the federal law considered in *Engine Mfrs. Ass'n* and *Toomer*, is whether the sale at issue was to the ultimate user or merely to a distributor.

Interestingly, neither definition mentions the relative age or even the condition of the vehicle. Treating newness as turning on whether a truck crane has been sold to the ultimate purchaser who will put it to use is a sensible approach.

In this case, it is undisputed that the entities which purchased the Crane before it was ultimately sold to American Aerial – Cropac and Empire – are both authorized Terex distributors. ECF No. 88, ¶¶2, 6, 7, 18, 20, 26, 35; ECF No. 95 at 2, ¶6, 9  It is also undisputed that Cropac and Empire purchased the Crane in order to resell it, and that American Aerial purchased the Crane in order to put it to use. *Id.;* ECF No. 95 at 1, ¶2. In light of these undisputed facts, I conclude as a matter of law that the Crane was "new" when Empire sold it to American Aerial. Therefore, the defendants' motions for summary judgment with regard to American Aerial's claim for breach of contract are **GRANTED**.

### 2.     Breach of Warranty

The defendants seek summary judgment as to American Aerial's warranty claims on several bases.

### (1)     Opportunity to Repair

Terex argues that American Aerial's breach of warranty claims must fail because Terex only learned of the Crane's alleged defects in late August 2012 and did not have the opportunity to repair the Crane before American Aerial filed its suit for breach of warranty and other claims. ECF No. 87 at 16. However, Terex does not deny that reports about the Crane's alleged defects were entered into its own Customer Relations Software ("CRM") starting in January 2012 and continuing

through August 2012.[2] *See* ECF No. 103 at 9, ¶28. *See also* ECF No. 82-8. This fact alone, viewed in the light most favorable to American Aerial, is sufficient to deny summary judgment on this basis.

### (2) Adequacy of Notice

> Where a tender has been accepted, the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy;

11 M.R.S.A. § 2-607(3)(a) (the "Maine UCC").

The parties dispute whether American Aerial provided notice to the defendants within a reasonable time as required by § 2-607(3)(a) of the Maine UCC. ECF No. 87 at 16-18; ECF No. 89 at 12. American Aerial argues that § 2-607(3)(a) requires merely that notification "be sufficient to let the seller know that the transaction is still troublesome and must be watched," ECF No. 96 at 8 (*quoting* § 2-607 Comment 4), and claims that its notice to the defendants was sufficient because it wrote to Empire on multiple occasions about its dissatisfaction with the Crane beginning in January 2012 and continuing through September 2012. ECF No. 93 at 16-18. American Aerial also points out that Read met with Ed Fleischer, the Terex representative, in August 2012 at American Aerial's office in Maine, where Fleischer inspected the Crane and

---

[2] American Aerial cites the deposition testimony of Ed Fleischer to establish that Terex used the CRM software, known as "Salesforce," as its "primary method" for tracking customer complaints and issues related to Terex equipment. *See* ECF No. 95 at 7, ¶28. Rather than explicitly deny this fact, Terex claims that Fleischer's testimony reveals only that he did not understand the question posed to him by plaintiff's counsel and therefore does not establish that Salesforce was the "primary method to manage customer relations." ECF No. 103 at 9, ¶28. This distinction is of little consequence because whether Salesforce was the primary method or a secondary method of managing customer relations, Terex does not deny that reports of problems with the Crane found their way into its system as early as January 2012.

spoke at length to Jim Read.  *Id.*; Pl. Add'l. Stmt. Mat. Facts, ECF No. 95 at 9-10, ¶¶43, 44, 45; ECF No. 96 at 8-9.

The defendants argue that American Aerial's communications to Empire regarding the alleged problems with the Crane constituted notice of *defects* only, rather than notice of a claimed *breach of warranty*, and assert that Read did not consider the warranty breached until September 2012.  ECF No. 89 at 12, 13.  The defendants argue that this distinction is important because "even if the seller knows of defects in the goods, the buyer must notify the seller of the buyer's claim that the defects constitute a breach."  ECF No. 87 at 17 (*citing M.K. Associates v. Stowell Products, Inc.*, 697 F. Supp. 20, 22 (D. Me. 1988)).  The defendants also maintain that American Aerial is a sophisticated purchaser because it has purchased or leased 12 cranes since it formed in 1997, and therefore, a more stringent notice requirement applies.  ECF No. 89 at 13 (*citing Industrial Fiberglass v. Jandt*, 361 N.W.2d 595, 598 (N.D. 1985) ("What constitutes adequate notice from an inexperienced consumer may not be sufficient in a transaction between professionals.")).

Although the question of whether notice was given is one of fact, the question of whether the notice satisfied the UCC is one of law.  *K&M Joint Venture v. Smith International, Inc.,* 669 F.2d 1106, 1111 (6th Cir. 1982).  For the following reasons, I find that American Aerial's notice to Empire was sufficient to comply with § 2-607(3)(a).

Though the defendants rely upon this court's opinion in *M.K. Assoc.*, the facts of that case are inapposite to the facts here.  In *M.K. Assoc.,* the defendant purchased

wooden dowels from the plaintiff and noticed that some of the dowels were defective but did not notify the plaintiff for four months. 697 F.Supp. at 20-21. The parties had one conversation about the defects after which the plaintiff manufacturer refused to allow the defendant purchaser to cancel his order over the defects. *Id.* at 21. The issue was not discussed further. *Id.* When the plaintiff sued the defendant for the remaining balance due from defendant on the order of dowels, the defendant argued that it was entitled to deduct damages for the defects pursuant to § 2-717 of the Maine UCC. *Id.* The court noted that "[e]ven if the seller knows of defects in the goods, the buyer must notify the seller of the buyer's claim that the defects constitute a breach." *MK Assoc.*, 697 F.Supp. at 22. The court concluded that "[i]n the conversation with [plaintiff], however, [defendant] did not clearly let [plaintiff] know that [defendant] considered the contract breached." *Id.*

In this case, by contrast, Read did not merely list the defects with the Crane, as the defendants suggest. *See* ECF No. 87 at 17-18; ECF No. 89 at 12. Having taken delivery of the Crane on December 30, 2011, Read wrote to Empire seven days later to revoke American Aerial's acceptance, stating that "it is my expectation that you will recognize that there was a failure to deliver a crane ready for service." ECF Nos. 95-9. Two days later, Read emailed Chet Zerrillo stating that he sought "to preserve all of the rights of American Aerial Services to ensure that it received what it paid for and to timely notify all concerned parties of the problem." ECF No. 95-10 at 2. More correspondence regarding American Aerial's dissatisfaction with the Crane followed over the next six months. *See* ECF Nos. 95-11, 95-12, 95-13, 95-14, 95-15, 95-16.

While several of these emails do indeed amount to a laundry list of alleged defects, when viewed in the aggregate, the Read emails simply are not comparable to the single conversation found to constitute lack of notice in *M.K. Assoc.* The magic words "breach of warranty" are not to be found in any of the emails discussed above, but nevertheless, I find that Read's correspondence to the defendants properly and timely put them on notice that American Aerial considered them to be in breach of warranty. Accordingly, I find that Empire's and Terex's respective motions for summary judgment should be **DENIED** with regard to the adequacy of American Aerial's notice.

### (3) Warranty Limitations Contained in the Cropac-Terex Contract

§ 2-318 of the Maine UCC states that:

> Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller or supplier of goods for breach of warranty, express or implied, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods.

11 M.R.S.A. § 2-318.

Terex argues that it excluded implied warranties when it sold the Crane to Cropac, and argues that the terms and conditions from that sale also apply to American Aerial pursuant to § 2-318 of the Maine UCC. ECF No. 87 at 18.[3] Terex correctly notes that "Maine's version of UCC § 2-318 does not conform to any of the three options provided by the drafters of the UCC," observing that the UCC's "Official

---

[3] Terex failed to cite the Sales Order Acknowledgment which contains the warranty exclusion and limitations on damages and other remedies. It can be found in ECF No. 77-2 at 7, ¶¶7, 8.

Commentary" does not apply under Maine law. *Id.* However, the very next sentence in Terex's brief contains a block quote from the Official Commentary, which Terex mistakenly identifies as "Maine's commentary." *Id.* (*quoting* § 2-318 Uniform Commercial Code Comment, ¶1 (Westlaw)); *compare with* 11 M.R.S.A. § 2-318 Maine Code Comment, ¶¶ 1-3 (Westlaw). If, as Terex itself concedes, the Official Commentary discusses language that Maine did not adopt, then the Official Commentary sheds little light on Maine law and the proper construction of § 2-318.[4]

American Aerial, on the other hand, cites the Law Court's opinion in *S.H. Nevers Corp. v. Husky Hydraulics*, 408 A.2d 676, 680-81 (Me. 1979), for the proposition that, under Maine law, a limitation or disclaimer of warranty is not effective unless it has been received by the buyer subject to those provisions. ECF No. 93 at 18-19. This court has accordingly refused to grant summary judgment in the past where a movant could not show that the non-movant plaintiff received warranty disclaimers. *McLaughlin v. Denharco, Inc.*, 129 F.Supp.2d 32, 39 (D.Me. 2001).

Therefore, in the absence of factual evidence suggesting that American Aerial actually received or agreed to the terms and conditions of the sale from Terex to Cropac, and in light of the authority cited by American Aerial, the warranty disclaimers contained in the sales contract between Terex and Cropac are not applicable and summary judgment should be **DENIED** with regard to this issue.

---

[4] Maine courts do generally regard the Official Commentary as an official source of guidance in the interpretation of the UCC. *McNally v. Nicholson Mfg. Co.*, 313 A.2d 913, 918 (Me. 1973). However, because Maine did not adopt any of the three options provided by the drafters of the UCC, the Official Commentary to §2-318, specifically, is not persuasive authority.

### (4)    Applicability of Terex's Limited Product Warranty

The defendants argue that American Aerial is subject to the exclusions and limitations contained in the Terex Limited Product Warranty, which they claim was incorporated into the sale of the Crane based upon a reference contained on the back of the Data Sheet, which states that "[t]he only warranty applicable to our equipment is the standard written warranty applicable to the particular product and sale and Terex makes no other warranty, express or implied." Terex Br., ECF No. 87 at 19-20 and Empire Br., ECF No. 89 at 12 *citing* Terex Data Sheet, ECF No. 95-7 at 26.  In response, American Aerial argues that it never received a copy of Terex's Limited Product Warranty and that Maine law requires actual receipt of the warranty disclaimer rather than mere incorporation by reference.  ECF No. 93 at 21. (*citing S. H. Nevers Corp.*, 408 A.2d at 680-81).

Neither Terex nor Empire have supported their arguments with factual evidence suggesting that American Aerial actually received or agreed to the Limited Product Warranty.  The defendants also failed to cite any authority which would support their argument that the Limited Product Warranty can be incorporated by reference based upon language contained on the Data Sheet.  Accordingly, I resolve this question in favor of American Aerial as the non-movant and find that summary judgment in favor of the defendants is inappropriate with regard to the exclusions and limitations contained in the Terex Limited Product Warranty.  The defendants' respective motions for summary judgment with respect to this issue are properly **DENIED.**

### (5) Implied Warranty of Merchantability

Both defendants argue that by inserting a warranty disclaimer into a block of text appearing on the back page of the Data Sheet, Terex properly excluded the implied warranty of merchantability, 11 M.R.S. § 2-314, which states in pertinent part that:

> **(1)** Unless excluded or modified by section 2-316, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind . . . .
>
> **(2)** Goods to be merchantable must at least be such as
> **(a)** Pass without objection in the trade under the contract description; and
> . . . .
> **(c)** Are fit for the ordinary purposes for which such goods are used;

11 M.R.S.A. § 2-314.

The implied warranty of merchantability may be excluded or modified pursuant to § 2–316, which states in pertinent part that:

> **(2)** Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous . . . .
>
> **(3)** Notwithstanding subsection (2)
>
> **(a)** Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty . . . .

11 M.R.S.A. § 2-316.

Conspicuousness, as used in § 2-316, is defined by 11 M.R.S.A. § 1-1201(10), which states that:

> "Conspicuous," with reference to a term, means so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:
>
>> **(a.)** A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font or color to the surrounding text of the same or lesser size; and
>>
>> **(b.)** Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

11 M.R.S.A. § 1-1201.

### (i) Exclusion of the Implied Warranty of Merchantability, § 2-316(2)

The defendants argue that the Data Sheet excludes the implied warranty of merchantability because of language contained in the middle of the block of text on the Data Sheet's back page, which reads, "[t]he only warranty applicable to our equipment is the standard written warranty applicable to the particular product and sale, and Terex makes no other warranty, express or implied." *See* ECF No. 75-4 at 23. This language does not appear in capital letters; does not appear in type that is larger than the surrounding text; does not mention merchantability; and does not appear in a contrasting font or color compared to the surrounding text. *See id.* There are no other marks that call attention to the quoted language. Therefore, I find that

the quoted language on the back page of the Data Sheet is not conspicuous within the meaning of § 2-316(2).

### (ii) Exclusion of All Implied Warranties, § 2-316(3)(a)

The defendants also assert that the language contained on the back page of the Data Sheet excludes implied warranties pursuant to § 2-316(3)(a), which allows warranty exclusions when accompanied by expressions like "as is," "with all faults," or "other language which in common understanding calls the buyer's attention to the exclusion of warranties." § 2-316(3)(a). Because the Data Sheet does not contain either the phrase "as is" or "with all faults," the defendants assert that the language on the back page constitutes the "other language" described by the statute. ECF No. 87 at 21-22. The defendants also cite authority stating that a warranty exclusion under § 2-316(3)(a) need not be conspicuous, unlike an exclusion under § 2-316(2). Empire Reply Br., ECF No. 104 at 5 (*citing DeKalb Agresearch, Inc. v. Abbott*, 391 F.Supp. 152, 155 (N.D. Ala. 1974); *Star-Shadow Products, Inc. v. Super 8 Sync. Sounds Sys.*, 730 A.2d 1081, 1084 (R.I. 1999).

I am not persuaded that the language on the back page of the Data Sheet constitutes an effective disclaimer of implied warranties pursuant to § 2-316(3)(a). For a warranty exclusion to pass muster, the statute requires commonly used phrases such as "with all faults," or "as is," which, due to their widespread usage, are immediately recognized as disclaiming warranties even upon casual perusal by non-lawyers. *See* § 2-316(3)(a). That the drafters of the UCC also permitted a seller to exclude implied warranties with "other language" left open the possibility that

parties could use other terms not specified in the statute, but which convey the same meaning as "with all faults" or "as is." The language on the back of the Data Sheet states simply that "Terex makes no warranty, express or implied." ECF No. 75-4 at 23. Nothing about this statement could reasonably be said to constitute a term which "calls the buyer's attention" to the attempted exclusion of all warranties in the same manner as the phrases "as is" or "with all faults," and therefore, it does not satisfy § 2-316(3)(a).[5]

Finally, Terex cites *Omni-Circuits, Inc. v. DRP, Inc.*, 1987 WL 7290 at *5 (N.D. Ill. 1987) to claim that it is entitled to summary judgment because the sale of the Crane to American Aerial was a commercial transaction involving experienced businesspersons rather than a consumer transaction involving ordinary purchasers. ECF No. 87 at 21. However, the *Omni-Circuits* court found that the disclaimer at issue in that case was capitalized, which was "sufficient to somewhat set it apart." *Omni-Circuits, Inc.* at *5. That is not the case with the language contained on the back page of the Data Sheet.

Accordingly, because Terex's purported disclaimer is not conspicuous, and because it does not contain other language that would "call the buyer's attention to the attempted exclusion," summary judgment in favor of the defendants should be

---

[5] Furthermore, the decisions cited by the defendants for the proposition that an exclusion need not be conspicuous are not controlling under the circumstances presented here. To hold otherwise would allow § 2-316(3) to function as a loophole for the conspicuousness requirement of § 2-316(2), rendering that section of the statute a nullity. Additionally, there is contradictory persuasive authority from other jurisdictions stating that "[c]ourts have generally read subsection (2)'s conspicuousness requirement into subsection (3)." *Scientific Leasing, Inc. v. Morris*, 1993 WL 524787,*2 (N.D. Ill. 1993). *See also MAN Roland Inc. v. Quantum Color Corp.,* 57 F.Supp.2d 568, 573 (N.D. Ill. 1999); *Bevard v. Akax Mfg. Co.*, 473 F.Supp. 35, 38 (E.D. Mich. 1979).

**DENIED** on the question of whether the implied warranty of merchantability has been properly excluded.

### (6)    Implied Warranty of Fitness for a Particular Purpose

The implied warranty of fitness for a particular purpose states that

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under section 2-316, an implied warranty that the goods shall be fit for such purpose.

11 M.R.S.A. § 2-315.  The implied warranty of fitness for a particular purpose is narrower than the implied warranty of merchantability.  *Lorfano v. Dura Stone Steps, Inc.,* 569 A.2d 195, 197 (Me. 1990).  The Official commentary to § 2-315 explains the meaning of a "particular purpose" as follows:

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.

§ 2-315, comment 2.

Empire argues that American Aerial did not advise it of a specific purpose or extraordinary use of the Crane.  ECF No. 89 at 14.  American Aerial counters that Empire knew its particular purpose for the Crane was its equipment rental business, which falls outside the scope of the ordinary purposes for which the Crane would be used because renting a crane "subjected [it] to more frequent and demanding uses than would ordinarily be expected."  ECF No. 96 at 12.  However, this is a conclusory statement for which American Aerial has cited no supporting authority or record

evidence.[6]  Absent a citation to such evidence or supporting legal authority, American Aerial has not established that the use of a crane as part of a crane rental business is outside the ordinary use for such equipment.  Accordingly, I find that summary judgment is appropriate and should be **GRANTED** as to both Empire and Terex with regard to American Aerial's claim for breach of the warranty of fitness for a particular purpose.

## C.    COUNT TWO – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

This count was dismissed when the court affirmed the recommended decision of the magistrate judge, concluding that "American Aerial's allegations do not support an inference that any action by Terex or Empire would support a plausible claim of dishonesty or failure to disclose a fact which either defendant had a duty to disclose." Report and Recommended Decision of the Magistrate Judge, ECF No. 21 at 6; and Order Affirming the Recommended Decision of the Magistrate Judge, ECF No. 32. Accordingly, no further action is required.

## D.    COUNTS THREE AND FOUR – FRAUD

American Aerial bases its fraud claim against Empire on two alleged misrepresentations.  The first alleged misrepresentation is Zerrillo's email to Read in which he stated that the Crane was "at the factory" and "just . . . off the line."  Pl.'s

---

[6]  American Aerial cites its Additional Statement of Material Facts, ECF No. 95 at 3, ¶10, which merely states that Zerrillo visited American Aerial's offices in Maine on several occasions and would have seen a "conspicuous sign" outside the entrance to the office and upon American Aerial's vehicles which stated "American Aerial Crane Rental, Steel Erection and Welding Services."  *Id.*  This does not constitute evidence that American Aerial's cranes were put to more frequent and demanding uses than would ordinarily be expected.

Opp'n. Brief, ECF No. 96 at 3 (*citing* ECF No. 95-7 at 2). The second alleged misrepresentation is the fact that Empire provided American Aerial with the Terex Data Sheet, which American Aerial asserts to be a material, intentional misrepresentation of the Crane's lifting capacity. ECF No. 96 at 4 (*citing* ECF No. 75-4). American Aerial also asserts that Terex is liable in fraud for the Data Sheet and for Empire's having provided the Data Sheet as Terex's alleged agent. ECF No. 93 at 10.

The essential elements of fraud, or fraudulent misrepresentation, are (1) that one party made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it was true or false; (4) for the purpose of inducing another party to act in reliance upon it; and (5) the other party justifiably relied upon the representation as true and acted upon it to its damage. *Flaherty v. Muther*, 17 A.3d 640, 654 (Me. 2011) (*citing Me. Eye Care Assocs. P.A. v. Gorman*, 942 A.2d 707, 711 (Me. 2008) (quotation marks omitted). As an initial matter, however, the parties dispute whether American Aerial's fraud claim is barred by the economic loss doctrine. ECF No. 89 at 7-8; ECF No. 87 at 12; and ECF No. 96 at 4-7.

The economic loss doctrine was adopted by the Law Court in *Oceanside at Pine Point Condominium Owners Ass'n, et. al. v. Peachtree Doors, Inc.,* 659 A.2d 267, 270 (Me. 1995). Stated succinctly, the doctrine holds that "courts generally . . . do not permit tort recovery for a defective product's damage to itself." *Id.* at 270. The Law Court observed that the rationale for the economic loss doctrine is that:

> [a] situation where the injury suffered is merely the failure of the product to function properly is distinguishable from those situations,

> traditionally within the purview of tort, where the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or property.

*Id.* (*citing East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 872 (1986)) (internal citations and quotation marks omitted). Thus, "damage to a product itself means simply that the product has not met the customer's expectations, or, in other words, that the customer has received insufficient product value." *Id.* (quotations omitted).

As it affirmed the application of the economic loss doctrine in Maine, the *Oceanside* court also affirmed its application to claims of negligent misrepresentation. *Id.* at 269-70; *see also Maine Rubber International v. Environmental Mgmt. Group, Inc.,* 298 F.Supp.2d 133, 136 (D. Me. 2004). The applicability of the economic loss doctrine to claims of *intentional* misrepresentation, however, is an open question under Maine law, as this court has noted previously, both in this and another case. Order on Mtn. to Amend, ECF No. 33 at 2. *See also Dermalogix Partners, Inc. v. Corwood Laboratories, Inc.,* 2000 WL 760732, *6 (D.Me. 2000).

It is generally accepted that the economic loss doctrine does not extend to claims of fraud where the alleged misrepresentation is independent of the contract, such as claims for fraud in the inducement. *Marvin Lumber and Cedar Co. v. PPG Industries, Inc.,* 223 F.3d 873, 885 (8th Cir. 2000) *(citing Huron Tool & Eng'g Co. v. Precision Consulting Servs.,* 209 Mich. App. 365 (1995)). However, this exception to claims that are independent of the parties' contract, like fraud in the inducement, is

subject to a widely-recognized limitation, which holds that "if the tort alleged is intentional or fraudulent misrepresentation by a seller to a buyer, but the misrepresentation only goes to the quality or quantity of the goods promised in the contract," then the economic loss doctrine bars the fraud claim. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 876 (9th Cir. 2007) (*citing All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 865-66 (7th Cir. 1999) ("Where there are well-developed contractual remedies, such as the remedies that the Uniform Commercial Code (in force in all U.S. states) provides for breach of warranty of the quality, fitness, or specifications of goods, there is no need to provide tort remedies for misrepresentation"). *See also Cerabio LLC v. Wright Medical Technology, Inc.*, 410 F.3d 981, 989-990 (7th Cir. 2005) (fraud in the inducement exception to the economic loss doctrine does not apply when the fraud pertains to the quality of the goods that are the subject matter of the contract); *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 679-80 (3rd Cir. 2002) (barring fraud claim under Pennsylvania law because appellant was unable to explain why contract remedies were not adequate to provide redress when the alleged misrepresentation related to the quality or characteristics of the goods sold)[7]; *Triad Group, Inc. v. Vi-Jon, Inc.,* 870 F.Supp.2d 645, 653-54 (E.D. Wisc. 2012).

---

[7] In barring the plaintiff's fraud claim, the *Werwinski* court "held that Pennsylvania's common law economic loss doctrine trumped Pennsylvania's statutory consumer protection statute." *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 275 (E.D. Pa., 2003). The Eastern District of Pennsylvania noted in *O'Keefe* that, notwithstanding *Werwinski*, Pennsylvania state courts have continued to allow damage awards in consumer fraud cases pursuant to that state's consumer protection statute. *Id.* Because there is no corresponding consumer protection statute invoked by American Aerial in this case, I cite *Werwinski* for its discussion of the economic loss doctrine and its application to common law claims of fraud.

Based upon the foregoing authority and the *Oceanside* court's stated rationale for applying the economic loss doctrine in other misrepresentation contexts, I conclude that Maine would extend the economic loss doctrine to claims for fraudulent misrepresentation by a seller to a buyer where the misrepresentation concerns the quality of the goods or product promised in the sales contract. This conclusion is consistent with the purpose of the economic loss doctrine, which is to limit duplicative tort remedies where the alleged harm suffered by the plaintiff can be addressed by claims for breach of contract or breach of express and implied warranties. Furthermore, this approach compliments an approach already taken under Maine law, whereby the measure of damages in tort for misrepresentation is the same as the measure of damages for breach of contract. *Williams v. Ubaldo*, 670 A.2d 913, 917 (Me. 1996) (discussing the measure of damages for breach of contract); *Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me. 1987) (discussing the measure of damages for fraud). *See also* Restatement (Second) of Torts § 549(1)(a) (1977). Thus, a plaintiff barred from bringing a fraud claim would still have recourse to recover the benefit of his bargain.

Accordingly, American Aerial's fraud claim is barred by the economic loss doctrine. The defendants' respective summary judgment motions (ECF No. 87 at 8-13 and ECF No. 89 at 4-9) are **GRANTED** with regard to Counts Three and Four.

## E. COUNT FIVE: PUNITIVE DAMAGES

An award of punitive damages requires evidence that a defendant engaged in tortious conduct and acted with malice, which can take the form of either actual ill

will toward the plaintiff or conduct by the defendant that "is so outrageous that malice . . . can be implied." *Tuttle v. Raymond,* 494 A.2d 1353, 1361 (Me. 1985).  In order to recover punitive damages, a plaintiff must prove malice "by clear and convincing evidence." *Id.* at 1354.

The grant of summary judgment in the defendants' favor with regard to American Aerial's fraud claim, *supra*, precludes an award of punitive damages because there is no tortious conduct upon which to base such an award. *See id.* at 1361 ("punitive damages are available based upon tortious conduct only if the defendant acted with malice.").  I conclude, therefore, that the defendants' respective summary judgment motions (ECF No. 87 at 14 and ECF No. 89 at 9) must be **GRANTED** as to Count Five as well.

## IV. CONCLUSION

For the foregoing reasons, the respective summary judgment motions of Terex and Empire are **GRANTED** with regard to American Aerial's breach of contract claim and breach of the implied warranty of fitness for a particular purpose (Count One); **GRANTED** with regard to American Aerial's claims for fraud (Counts Three and Four); and **GRANTED** with regard to American Aerial's claim for punitive damages (Count Five).  The defendants' summary judgment motions are **DENIED IN PART** with regard to American Aerial's breach of the implied warranty of merchantability claim (Count One).

**SO ORDERED.**

This 15th day of August, 2014            **/s/ JON D. LEVY**
                                                          **UNITED STATES DISTRICT JUDGE**