## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **AMERICAN AERIAL SERVICES, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Case No. 2:12-cv-00361-JDL** |
| **TEREX USA, LLC, and** | ) |
| **THE EMPIRE CRANE COMPANY, LLC,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER ON TEREX'S MOTION TO EXCLUDE THE REPORT, OPINIONS, AND TESTIMONY OF REGINALD PERRY (ECF NO. 121)

American Aerial Services, Inc., seeks damages including lost profits as a result of its purchase of a Terex T-780 truck crane ("the Crane" or the "T-780") manufactured by Terex USA, LLC, and sold by The Empire Crane Company, LLC. To prove its lost profits, American Aerial intends to introduce the testimony of its damages expert, accountant Reginald Perry. On March 4, 2015, Terex filed a Motion to Exclude Perry's report, opinions, and testimony (ECF No. 121) and also requested a hearing pursuant to Federal Rule of Evidence 104(a). Empire Crane joins in the motion (ECF No. 127). The hearing was held on April 7, 2015.

For the reasons discussed below, I grant the motion in part and deny the motion in part.

## I. LEGAL ANALYSIS

Terex's motion largely relates to the standards set forth in Federal Rule of Evidence 702. The rule governs the admissibility of expert testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), the Supreme Court assigned a gatekeeper role to the courts to assure that expert testimony is not introduced at trial unless Rule 702's requirements have been met.  *See also, Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) (instructing that the principles of *Daubert* apply equally to non-scientific expert opinion testimony).  Thus, it is my responsibility to ensure that a sufficiently-qualified expert provides testimony that "rests on a reliable basis." *Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 25 (1st Cir. 2006).  "Expert testimony may be excluded if there is 'too great an analytical gap between the data and the opinion proffered.'" *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

"The object of *Daubert* is 'to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* (quoting *Kumho,* 526 U.S. at 152).

"Expert testimony may be more inferential than that of fact witnesses, but an expert opinion must be more than a conclusory assertion about ultimate legal issues" to be admissible. *RTR Techs., Inc. v. Helming*, 707 F.3d 84, 93 (1st Cir. 2013) (internal quotation omitted).

## A.   Issues Presented

Terex argues that Perry's calculations of the lost revenue from American Aerial's crane rental and steel erection businesses are unreliable because he failed to perform independent analyses of information provided to him by James Read, President of American Aerial, and contained in American Aerial's financial records. ECF No. 121 at 2.   Accordingly, Terex contends that Perry's opinions should be excluded pursuant to Rule 702 because they are not based on either sufficient data or independent analysis. *Id.* at 15.   Terex also argues that Perry's opinions should be excluded under Federal Rule of Evidence 403 because they are not based upon "good grounds" and would be unfairly prejudicial. *Id.* at 14-15.

Terex specifically asserts that Perry: (1) had insufficient information upon which to determine how often American Aerial could have rented the crane to third parties (the "crane utilization rate") from January 16, 2012, until August 30, 2012; *id.* at 8-9; (2) increased the crane utilization rate from two days to three days per week for the period beginning after August 30, 2012, based on his unsupported belief that there was an increase in business in the construction industry, rather than upon an independent analysis, *id.* at 9-10; (3) had insufficient information to determine American Aerial's hourly net revenue from crane rentals and failed to verify Read's

conclusions pertaining to workers' compensation expenses and insurance-related costs, *id.* at 10; (4) failed to verify information provided by Read when he determined the expenses American Aerial incurred by renting cranes from third parties in order to meet its obligations on other projects, *id.* at 11; (5) improperly included revenues from the crane rental business when considering historic revenue growth to determine how much net income American Aerial lost from its steel erection business, *id.* at 12; (6) failed to perform a quantitative analysis to support his characterization of a 2012 increase in American Aerial's revenues as being due to the purchase of the Crane, and failed to perform an analysis to support his characterization of a corresponding decrease in revenues in early 2013 as being due to the Crane's being out of service, *id.* at 12-14 (citing *Downeast Ventures, Ltd. v. Washington Cnty.*, 2007 WL 679887 (D. Me. Mar. 1, 2007)); and, finally, (7) that Perry "did not even conduct a rudimentary analysis" of American Aerial's financial records to confirm his opinion that there was a "lag" which explained a continued increase in revenues even after the Crane was removed from service. *Id.* at 14.

American Aerial counters that Perry's reliance upon interviews with Read and with an official from another crane rental company, his use of American Aerial's financial statements, and his knowledge of the construction industry, and 39 years of experience as an accountant with clients who own and operate heavy equipment are sufficient to render his opinions admissible under Rule 702. ECF No. 149 at 2. American Aerial also argues that an expert's reliance on financial information provided by a client goes to the weight of the expert's opinion rather than the opinion's

admissibility. *Id.* at 5 (citing *Great N. Storehouse, Inc. v. Peerless Ins. Co.*, 2000 WL 1900299 (D. Me. Dec. 29, 2000) and *Kirouac v. Donahoe*, 2013 WL 173475 (D. Me. Jan. 16, 2013)).

## B.  Lost Profits Analysis

Perry submitted a written report of his findings dated August 1, 2013 (ECF No. 121-1), supplemented by a second report dated February 25, 2014 (ECF No. 121-4). He opined that as a result of American Aerial's "loss of use of a Terex T780 . . . purchased in December of 2011," ECF 121-1 at 3, it would suffer total "lost crane rental net revenues" for the period from January 16, 2012 to July 7, 2014, of $616,848, ECF 121-4 at 1.   He also determined that American Aerial suffered additional "consequential damages resulting from [its] inability to use the Terex T780 in the steel erection segment of its' [sic] business" of $138,338 for the period ending February 28, 2014.  ECF 121-1 at 6, 8.

Perry's damages calculations were based on his findings that: (1) American Aerial lost overall revenue beginning in 2013 because of its inability to rent the Crane after August 30, 2012, *id.* at 4; (2) the amount of the lost crane rental net revenue could be determined based on the assignment of a reasonable utilization rate—i.e., the number of days and hours per week the crane would have been rented—multiplied by a reasonable net hourly rate after expenses, *id.* at 5; (3) American Aerial suffered additional lost revenues to the steel erection segment of its business based on the "luster effect" the addition of the Crane had on the company's standing in the crane rental market, and the loss of that luster "attributable to the perception of

5

[American Aerial's] consumer base that the Company was experiencing financial difficulties" once the Crane was taken out of service, *id.* at 6-7; and (4) American Aerial also suffered lost revenues in the steel erection segment of its business by incurring rental expenses to rent cranes to replace the Crane, *id.* at 6.

*Daubert* calls upon me to consider the sufficiency of the facts and data, as well as the reliability of the principles and methods, employed by Perry. *See Daubert,* 509 U.S. at 589-90. *See also,* Fed. R. Evid. 702(b), (c). I will address Terex's arguments by examining Perry's lost profits analysis relative to (1) American Aerial's overall lost revenue; (2) lost crane rental net revenue; and (3) lost revenue in American Aerial's steel erection business.

### 1.    Overall Lost Revenue

Perry first determined that American Aerial had experienced an overall loss in gross revenue due to the problems with the Crane. He identified January 16, 2012, as the date American Aerial began to generate additional revenue from the Crane because that was the "date when the T780 was fully equipped with additional components." ECF No. 121-1 at 4. He then compared American Aerial's total revenues of $787,595 for the six-month period that began July 1, 2011, and ended December 31, 2011, with the company's total revenues of $1,112,771 for the six-month period that began January 1, 2012, and ended June 30, 2012. *Id.* He reported that after July 1, 2012, the company's "[o]verall revenues continued to rise through February of 2013 and then dropped precipitously for the period of March 2013

through July 2013." *Id.*   In his report, Perry adopted Read's explanation for the company's precipitous drop in revenue beginning in February of 2013:

> James Read, owner and President of American Aerial Services[,] attributes this significant drop in 2013 revenues to the marketplace awareness that "AAS" was no longer in the crane rental business and his customer base making negative value judgments regarding the overall financial condition of his company.

*Id.* Other than lost revenues resulting from an inability to rent the Crane, the report did not cite any other basis to establish a causal connection between the Crane being taken out of service and American Aerial's subsequent decline in revenues.

As a general rule, an expert may rely on financial data supplied by a plaintiff to conduct a financial analysis without having independently verified the data. *Downeast Ventures, Ltd.,* 2007 WL 679887, at *4 (citing *Great N. Storehouse, Inc.,* 2000 WL 1900299, at *2). On the other hand, opinion testimony based on information that does no more than equip a jury to make a damages determination based on "pure speculation" fails under Rule 702. *Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F.3d 68, 82 (1st Cir. 2002) (quoting *Wallace Motor Sales, Inc. v. Am. Motor Sales*, 780 F.2d 1049, 1062 (1st Cir. 1985)).   The record in this case demonstrates that the limited information relied on by Perry, and the absence of a methodology, provide insufficient support for his conclusions regarding American Aerial's overall revenues.

Perry's opinion that the increase and the drop in American Aerial's 2013 revenues were causally connected to the market's awareness that American Aerial had left the crane rental business and may have become financially unstable was

supported by nothing other than Read's opinion.   The only data Perry considered in relation to his explanation was the company's gross revenues.  *See* ECF No. 121-1 at 4, 13-18.  He did not consider financial information regarding the revenue that had been generated by the rental of the Crane when it was in service, as well as the expenses associated with it; nor did he consider the rental revenue and expenses associated with each of the four other cranes operated by American Aerial in 2012 and 2013.  Perry also did not consider market data regarding the level of demand for the rental of a crane with the capacity of the T-780, or data or information regarding customers or rental opportunities that American Aerial lost because of the unavailability of the Crane beginning in September 2012.  Perry was also not provided any anecdotal information corroborating Read's characterization of the market's reaction to the arrival and departure of the Crane from American Aerial's operations.

In addition, Perry's assumption that American Aerial was no longer in the rental business once the Crane was taken out of service in August 2012 is contrary to Exhibit 6 to his report.  *Id.* at 24.  It indicates that after the Crane was taken out of service in August 2012, American Aerial continued to receive crane rental income during the ensuing twelve month period ending July 2013.  *Id.*

Accordingly, Perry did not analyze financial data or engage in quantitative analysis to either confirm or dispute Read's opinion that the company's increase in revenues in 2012 and decrease in revenues in 2013 were related to the Crane.[1]

---

[1] Perry acknowledged that he had not received from American Aerial "any kind of a breakdown about whether the significant drop in 2013 revenues was due entirely to the crane being taken out of service

Pinning the company's overall financial performance on the Crane, untethered from any data or methodology that provides insight into American Aerial's actual rental experience with it and its other cranes, is speculative.

### 2.   Lost Crane Rental Net Revenue

Perry determined the specific amount of American Aerial's lost rental revenue by determining a "reasonable utilization rate" (the rate at which the crane could reasonably be expected to have been rented) and a "reasonable hourly rate net of related expenses" (the net revenue for each hour the crane was rented each week). ECF No. 121-1 at 5.  He employed a utilization rate for the period of January 16, 2012, through August 30, 2012, of two days per week for ten hours per day.  *Id.*  He multiplied this by his estimate of a reasonable net hourly rate after expenses of $181 per hour.  *Id.*  This results in lost net rental revenue for the period of January 16, 2012, through August 30, 2012, of $109,686.  *Id.*  Perry next employed a utilization rate for the period beginning August 31, 2012, and thereafter of three days per week for ten hours a day.  *Id.*  Accordingly, for the period ending July 7, 2014, he determined the lost net rental revenue was $507,162.  ECF 121-4 at 1.  Combining the two periods, Perry opined that American Aerial suffered total lost rental revenue of $616,848 as of July 7, 2014.  *Id.*

Perry determined a three-day utilization rate "was a conservative utilization rate for rental of the T-780" based on conversations he had with Read regarding

---

or partially[.]"  ECF No. 121-2 at 8.  When asked, "And you didn't do any independent work to try to quantify that number, did you?", he responded, "No."  *Id.*  Perry was then asked, "And as you sit here right now, you can't quantify that number, can you?", and he responded, "That's correct."  *Id.*

American Aerial's past rental experience, and with Hadley Moore, the Chief Financial Officer for The Cote Corporation, which rents cranes similar to the T-780.  ECF 149-1 at 2.  He also relied on his past experience in financial accounting in the construction industry, as well as his review of the financial data he received from American Aerial, including the company's financial statements and corporate income tax returns.  *Id*.  He further explained that he used a two-day utilization rate "for an initial period from January 16, 2012, through August 30, 2012[,] to account for the fact that American Aerial was effectively re-entering the crane rental market."  ECF No. 149-1 at 3.

Conversations with industry insiders, such as those Perry had with Moore and Read, may properly inform a damages expert's opinion.  *See Great N. Storehouse, Inc.,* 2000 WL 1900299, at *2 (citing *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship.*, 234 F.3d 58, 67 (1st Cir. 2000) (damages expert testified that he had spoken with the principal operator of the plaintiff marina and others in arriving at his opinion on the amount of damages)).  Perry's reliance on his own accounting experience in the heavy equipment industry and American Aerial's financial records undercuts Terex's assertion that Perry's sole basis for his conclusions was the information he received from Moore and Read.[2]  *See* ECF No. 149-1 at 2-3.

---

[2] Terex cites Perry's deposition testimony to the contrary, *see* ECF No. 121-2 at 15-16, and argues that Perry had access to records documenting the prior crane utilization rate, but did not request or review them.  ECF No. 121 at 9.  To the extent that Terex wishes to challenge Perry on this apparent contradiction, it may do so by cross-examining him.

Perry's opinion with respect to the utilization rates may have a weak factual basis, but it does have a basis. Where, as here, the "adequacy of the foundation for the expert testimony is at issue, the law favors vigorous cross-examination over exclusion." *Zuckerman v. Coastal Camps, Inc.,* 716 F. Supp. 2d 23, 28 (D. Me. 2010) (internal quotation omitted). "When the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury." *Milward,* 639 F.3d at 22 (quoting *United States v. Vargas*, 471 F.3d 255, 264 (1st Cir. 2006) (quotation marks omitted)). *See also, Kirouac,* 2013 WL 173475, at *2 ("None of these issues precludes [the expert's] testimony, but they are all fair game on cross-examination."). I conclude that Perry's opinion regarding the utilization rates satisfies the requirements of Rule 702(b).

The same is true regarding the reasonable hourly rate, net of related expenses, and the ten-hour day Perry applied to the utilization rates. Perry arrived at a net hourly rate of $181 by determining a gross hourly rate of $225, and then reducing it by the hourly pay and benefits for crane operators ($30), the pro rata cost of diesel fuel ($6), casualty and liability insurance ($5), and miscellaneous repairs ($3). ECF No. 121-1 at 26. He based these estimates on industry research and information received from crane rental companies, *see id.* n.1, information provided by Read, as well as his own experience related to financial accounting in the construction industry, *see* ECF No. 149-1 at 3. The ten-hour day applied by Perry was based on "the standard rental day for American Aerial in its crane rental business." *Id.* at 2. An expert may reasonably rely on a historical fact provided by a business-owner

regarding the business's standard practices.  *See Great N. Storehouse*, 2000 WL 1900299, at *2.

Perry's net hourly rate determination and his use of a ten-hour day satisfy the requirements of Rule 702.

### 3.    Lost Profits in American Aerial's Steel Erection Business

Perry also opined that American Aerial suffered additional consequential damages to the steel erection segment of its business based on the "luster effect" the addition of the Crane had on the company's standing in the crane rental market, and the loss of that luster "attributable to the perception of [American Aerial's] consumer base that the Company was experiencing financial difficulties" once the Crane was taken out of service.  ECF No. 121-1 at 6-7.  He explained that the "confidence engendered by having a large piece of industrial equipment opened up business opportunities otherwise not available," and that after the Crane went out of service in August 2012, "[it] became idle and the 'confidence engendered' effect was lost and revenues began to fall after February 2013[.]"  *Id.* at 7.  He further explained that "[t]he lower revenues from lost business opportunities began to show up after February 2013 because of the lag between the booking [of] revenues and its[] recognition in the accounting records."  *Id.*

Perry calculated the damages by assuming that the company's 20% annual rate of a revenue increase experienced in 2012 would have continued, and not decline as it did.  *Id.*  Because total revenues in 2012 were $2,428,500, Perry assumed that 20% of that amount—$485,700—would have been generated as additional revenue

for the period March 1, 2013 through February 28, 2014, and that 10% of that amount—$48,570—represents the net income loss. *Id.* at 8. Perry then identified an additional $89,768 as the cost of "substitute crane rentals." *Id.* The total lost profits for the steel erection line of American Aerial's business were set at $138,338 through February 28, 2014. *Id.*

The sole support for Perry's opinion regarding a causal connection between the "luster effect" the Crane initially provided and the increase in revenues in 2012, and the loss of the "luster effect" once the Crane went out of service and the decrease of revenues in 2013, was Read. Read did not provide Perry any documentation, or data to back-up his assertion of a causal connection between the Crane and the company's overall standing in the marketplace, and Perry did not employ any quantitative analysis to test Read's opinion. ECF No. 121-2 at 33. Perry's adoption of Read's opinion does not meet the standards of Rule 702 because it is not based on sufficient facts or data, nor is it the product of reliable principles and methods. Perry's opinion regarding the company's lost net income, in the amount of $48,570 through February 28, 2014, will be excluded.

On the other hand, Perry's finding that American Aerial incurred $89,768 in total to rent cranes to replace the T-780 in the steel erection side of its business is a fact supported by a business record supplied to Perry. ECF No. 149-1 at 3. As previously discussed, an expert may generally rely on a company's financial records without independently verifying the data contained in those records. *See Downeast Ventures, Ltd.,* 2007 WL 679887, at *4. That Perry did not independently verify the

accuracy of the total is grist for cross-examination, but is not a basis for exclusion. Thus, there is sufficient factual support for Perry's identification of $89,768 in substitute crane rental costs as the source of lost profits in the steel erection side of American Aerial's business.

### 4. "Lag" Explaining American Aerial's Decrease in Revenues

Perry noted in his report that, despite the fact that the Crane was removed from service at the end of August 2012, American Aerial did not realize lower revenues until February 2013.  ECF No. 121-1 at 7.  As mentioned above, Perry attributed this to "the lag between the booking [of] revenues and [American Aerial's] recognition in the accounting records."  *Id.*  Terex objects that Perry did not perform a quantitative analysis and should therefore not be permitted to testify about the increase in revenues.  ECF No. 121 at 14.  Yet, in arriving at this opinion, Perry relied upon conversations with Read, his general knowledge of the construction industry, his accounting experience, ECF No. 121-2 at 39, 41-43, as well as his review of American Aerial's financial statements, ECF No. 149-1 at 1-2.  To the extent that Perry's opinion has a weak factual basis, the preferred course is cross-examination rather than exclusion.  *See Zuckerman*, 716 F. Supp. 2d at 28.  I deny the motion on this issue.

### C.   Federal Rule of Evidence 403

Terex also contends that Perry's opinions and testimony should be excluded pursuant to Rule 403, on the basis that they are unfairly prejudicial to Terex and likely to confuse or mislead the jury.  ECF No. 121 at 14-15.

Rule 403 states that evidence may be excluded if its probative value is "substantially outweighed" by a danger of one or more of the following: "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  The First Circuit has noted that "all probative evidence is prejudicial, and the district court [does] not abuse its discretion in finding that . . . statements [are] not *unfairly* prejudicial." *Kelly v. Airborne Freight Corp.*, 140 F.3d 335, 348 (1st Cir. 1998).  "In Rule 403, 'prejudice' does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *Voisine v. Danzig*, 1999 WL 33117132, at *2 (D. Me. Oct. 26, 1999) (citing 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5215 at 274–75 (1978)).

To the extent I have excluded portions of Perry's testimony based on Rule 702, Terex's objection under Rule 403 is moot.  As to the remainder of Perry's testimony, Terex has not offered reasons for me to conclude that Perry's testimony will be unfairly prejudicial, apart from the unsuccessful arguments it made in support of its argument for exclusion of Perry's testimony under Rule 702.  Terex's objection on the basis of Rule 403 is properly denied.

15

## II. CONCLUSION

For the reasons discussed above, Terex's Motion to Exclude Reginald Perry's Expert Report, Opinions, and Testimony (ECF No. 121) is **GRANTED IN PART** as follows:

1. Perry may not testify to his opinion that American Aerial's overall increase in revenues in 2012 was related to the "luster effect" that the Crane had on the company's standing in the marketplace, and that American Aerial's decrease in revenues in 2013 was attributable to the perception among its customer base that the company was experiencing financial difficulties.

2. Perry may not testify to his opinion that American Aerial suffered additional consequential damages to the steel erection segment of its business in the amount of $48,570 through February 28, 2014, based on the "luster effect" the addition of the Crane had on the company's standing in the crane rental market, and the loss of that luster based on a perception that the Company was experiencing financial difficulties once the Crane was taken out of service.

Terex's Motion to Exclude Reginald Perry's Expert Report, Opinions, and Testimony is **DENIED** in all other respects.

SO ORDERED.

This 29th day of April 2015.

     /s/ JON D. LEVY
U.S. District Judge

16